**UNITED STATES of America, Appellee,**

v.

**Trevor WATSON, Defendant, Appellant.**

**No. 95–1384.**

United States Court of Appeals, First Circuit.

Heard Jan. 10, 1996.
Decided Feb. 2, 1996.

Robert M. Pollak, Arlington, MA, by appointment of the court, for appellant.

Paul G. Levenson, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellee.

Before SELYA, BOUDIN, and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

A pistol assault on a teenager in the Cathedral Housing Project of the South End of Boston led ultimately to the conviction of Trevor Watson for the federal offense of possession of a firearm by a person previously convicted of a felony, 18 U.S.C. § 922(g)(1). Watson was identified by the victim within twenty minutes of the attack in a show-up in the project conducted by the alert Boston police officers on the scene. Watson was sentenced to 64 months of imprisonment followed by three years of supervised release.

Watson appeals, saying the district court erred in denying his motion to suppress the on-the-scene identification and in denying his motion for acquittal. He also says the government withheld exculpatory evidence. Finding that the district court's conclusions, after it carefully and sensitively considered these arguments at the trial stage, were correct, we affirm.

The jury was entitled to find the following urban saga. As Alexander Milette was bicycling home to the Cathedral Project, a Porsche drove past him and stopped in front of his house. Trevor Watson got out of the car, carrying a loaded pistol of the type favored by the Boston police, a Glock 9mm semi-automatic. After accusing Milette of liking "hitting on" women, Watson aimed the gun at Milette's stomach. Someone said "Don't shoot him."

Instead, Watson pistol-whipped Milette's head, causing the gun to fire into a building and then to jam. Milette, bleeding, ran while Watson unjammed the gun and fired again, hitting the building Milette ran behind. Milette sought sanctuary at a friend's house and was helped with his bleeding head.

Watson had jumped back into the Porsche, only to have it stall out in a deep puddle. A nearby off-duty Boston Police officer, Officer Christopher Shoulla, heard the shots, drove to the project, and put out a call on his police radio. Officer Shoulla saw Watson and asked him to stop. Watson instead fled, clutching his right pocket, and, ironically, ran right past Milette and past another youth. Two other Boston officers arrived and gave chase. Watson threw the gun, as he ran, into a small garden. Officer Shoulla stopped Watson at gunpoint. When the officers patted down Watson and determined he had no gun, they retraced Watson's steps and found it within forty seconds.

One officer saw Milette, still holding a bloody towel to his head, and had the others bring Watson over. Watson was brought over by patrol car and Milette was asked by the police, "What's the story?" Milette looked, and identified Watson as his assailant. He later testified he was 100% sure of that identification. Watson was also identified by the other youth past whom he had run. The two spent cartridges from the scene of the assault matched the pistol Watson discarded.

*The Show–Up*

▮ Watson attacks the show-up identification as impermissibly suggestive and unreliable and claims error in the denial of his motion to suppress. A district court's denial of a motion to suppress will be upheld if any reasonable view of the evidence supports the denial. *United States v. de Jesus–Rios,* 990 F.2d 672, 677 (1st Cir.1993). The findings of the district court after a hearing on a pretrial motion to suppress are binding on the court of appeals unless they are clearly erroneous. *Id.*

▮ Evidence of pre-trial identification may be subject to constitutional limitations under the Due Process Clause. *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). To determine whether evidence of a pre-trial identification should be suppressed, a two-pronged analysis is required. *de Jesus–Rios,* 990 F.2d at 677. First, the court must determine whether the procedure was impermissibly suggestive. *Id.* If it so finds, it must decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure. *Id.* Furthermore, before suppressing identification evidence, a "court must be persuaded that there was a very substantial likelihood of irreparable misidentification," and only in extraordinary circumstances should identification evidence be withheld from the jury. *Id.* (internal quotations omitted).

▮ There is no reason to disturb the district court's finding here that the show-up identification procedure was not unnecessarily suggestive, a finding that eliminates the due process argument. Show-ups that take place immediately after the offense has been committed may be necessary in order to avoid the mistaken apprehension of the wrong person. *See, e.g., United States v. Bautista,* 23 F.3d 726, 730 (2d Cir.) ("where an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity"; internal quotations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *Johnson v. Dugger,* 817 F.2d 726, 729 (11th Cir.1987); *United States v. Bagley,* 772 F.2d 482, 492–93 (9th Cir.1985) (one-on-one show-up at bank shortly after commission of bank robbery held to be a "legitimate" procedure), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326

(1986); *Frank v. Blackburn,* 605 F.2d 910, 912–13 (5th Cir.1979) (procedure of taking suspect apprehended less than thirty minutes after robbery seven blocks from robbery to the scene of the crime not unnecessarily suggestive without words or actions by police to aggravate suggestiveness), *modified on other grounds,* 646 F.2d 902, *cert. denied,* 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981).

■ The case on which Watson relies, *Velez v. Schmer,* 724 F.2d 249 (1st Cir.1984), proves no help to him, as the police conduct there was at the other end of the scale. There, the show-up was staged at 3:00 a.m., nine and a half hours after the crime, at the station house, and the defendant was presented to the youthful victims who were asked "This is him, isn't it?" *Id.* at 250. Here, the crime was very fresh, the police not suggestive, and had Watson not been the assailant, Milette could easily have said so. While show-ups, as the district court recognized, contain some inherent element of suggestiveness, the finding that this one did not cross the line was not erroneous.[1]

*The Brady Argument*

Defendant also argues, without avail, that the government failed to disclose two items of information in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Rumor*

The first has to do with a rumor. The presentence report recounted a rumor that Mi-lette's brother, who looks like Milette, threw water at a woman described as Watson's girlfriend some time before the assault. Defendant moved for a new trial based on this "new" evidence, which the district court denied.

■ To show a *Brady* violation, the defendant must show that the withheld "evidence was exculpatory, as measured by its materiality." *United States v. Hemmer,* 729 F.2d 10, 14 (1st Cir.), *cert. denied,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984). Evidence is material if there is a reasonable probability that the outcome of the proceeding would have been different had the evidence been disclosed. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985).

■ The rumor was obviously inculpatory, not exculpatory. The argument presented—that if he had known of the rumor, Watson could have found a woman, not Watson's girlfriend, who had water thrown on her and thus come up with a different assailant out to get Milette's brother (and inadvertently Milette)—is sheer speculation and not enough to meet Watson's burden.[2] In light of the identification of Watson by Milette and by the youth, the gun evidence, and the police testimony, there is no "reasonable probability that … the result of the proceeding would have been different." *Id.*

*Exposure to Photograph*

■ A federal agent may have shown Milette a photograph of Watson before Mi-

---

1. The district court's second-level finding that the identification was reliable under the five-factor test articulated in *de Jesus–Rios* was also not erroneous. *See de Jesus–Rios,* 990 F.2d at 677 (court should consider "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation"; internal quotations omitted); *see also Manson v. Brathwaite,* 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972). The only factor that weighs against admitting the out-of-court identification is that there was no prior description of the assailant. However, " 'the absence of a prior description by the witness does not necessarily render his or her subsequent identification suspect.' " *United States v. Mohammed,* 27 F.3d 815, 822 (2d Cir.) (quoting *United States v. Concepcion,* 983 F.2d 369, 377–78 (2d Cir.1992), *cert. denied,* — U.S. —, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993)), *cert. denied,* — U.S. —, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994). Here, like in *Mohammed,* where the witness had ample opportunity to focus his attention on the suspect and identified the suspect minutes after the assault, we agree that the identification was reliable.

2. Defendant also claims that he could have put Watson's girlfriend on the stand to testify that no one threw water at her. However, the relevancy of that testimony would depend upon the admission of the rumor, which the district court correctly found was inadmissible hearsay.

lette testified at the suppression hearing. While such conduct, if it occurred, was both improper and could have jeopardized the government's case,[3] on the facts here there is no resulting reversible error. That is because Watson was given this information before trial, the government did not attempt an in-court identification after the purported showing, and Watson's case was helped, not hurt, by such conduct. The agent's usual practice was to carry photographs of the defendant and subpoenas in the same file, which may have resulted in Milette seeing Watson's photograph.

Immediately on learning that Milette said he had been shown a photograph of Watson, the prosecutor notified defense counsel shortly before trial began on October 3, 1994. On October 5, the district court held a *voir dire* on the issue at which federal agent Sheila O'Hara testified that she carried photographs of defendant in her case file and may have inadvertently exposed them to Milette when serving him with one of several subpoenas. The district court found that this happened no sooner than the day of the suppression hearing. The defendant used the information to his advantage by calling Agent O'Hara as his sole defense witness to testify that Milette did not identify the defendant as his assailant even if he saw a photograph of him and to attack the investigation.

Watson's *Brady* violation argument is misplaced because the evidence was disclosed before trial and there was no demonstrable prejudice from the delay in the disclosure. *See United States v. Innamorati*, 996 F.2d 456, 480 (1st Cir.) (citing *United States v. Devin*, 918 F.2d 280, 290 (1st Cir.1990)), *cert. denied*, — U.S. —, 114 S.Ct. 409, 126 L.Ed.2d 356 (1993). Defendant does not even argue that the delay, if any, was prejudicial. Indeed, in light of the district court's careful handling of this matter and the failure of the defendant to seek a continuance upon learning that Milette may have been exposed to a photograph of Watson, any delay was not materially prejudicial. *See Unit-*

ed States v. Osorio*, 929 F.2d 753, 758 (1st Cir.1988) ("Generally we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously.").

Further, the only identification Milette made was at the show-up within 20 minutes of the assault. No in-court identification was sought by the government. At the suppression hearing, almost a year after the assault, Milette testified that at the time of the show-up identification he was sure Watson was his assailant, and agreed that he had recently told Agent O'Hara that he could no longer identify his assailant. The fact that he may have been shown a photo after the show-up is not material, and the district court correctly found that it could not be the basis for a new trial.

*Motion for Acquittal*

■ Defendant also argues that the district court erred in denying his motion for judgment of acquittal. We review the evidence presented at trial, viewed in the light most favorable to the government, to see if it could establish each element of the offense charged beyond a reasonable doubt. *United States v. Hernandez*, 995 F.2d 307, 311 (1st Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993). Watson argues that the motion should have been granted because his right under the Sixth Amendment to cross-examine Milette was impaired because of the out-of-court nature of Milette's identification of Watson.

But *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), forecloses any such argument. The Court there said:

"[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose ... infirmities [such as witness' forgetfulness, confusion or evasion] through cross-examination, thereby calling to the atten-

---

**3.** If the single photo indeed had been shown to Milette in an effort to bolster his identification of Watson, we join the comments of the experienced district judge that he was "astonished that a fede͟ ᵗ investigative agency has an agent who goes      ͻpens her file folder with a picture of the det᷈ ꭓ ᴧant as a matter of course."

tion of the factfinder the reasons for giving scant weight to the witness' testimony."

*Id.* at 558, 108 S.Ct. at 842 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 21–22, 106 S.Ct. 292, 295–96, 88 L.Ed.2d 15 (1985) (per curiam)). Defense counsel's vigorous attack on the reliability of Milette's out-of-court identification itself refutes the argument that Watson did not have a full and fair opportunity to probe. Indeed, this case presented a significantly better opportunity to cross-examine than did *Owens.*

Watson also argues that the use of Milette's statement at the suppression hearing—that he was 100% sure at the show-up that the person he identified was his assailant—to refresh his memory at trial violated the Confrontation Clause. Watson's claim is that the statement of certainty was not subject to unrestricted cross-examination because defense counsel did not know at the time of the suppression hearing that Milette may have been suggestively exposed to Watson's photograph. Accepting the dubious premise that Milette was not subject to unrestricted cross-examination at the suppression hearing,[4] there was ample opportunity to cross-examine the witness as to the reliability of that statement at trial. There was no violation of the Confrontation Clause. *See Owens,* 484 U.S. at 560, 108 S.Ct. at 843. As a result, the district court correctly denied the motion to acquit.

### Conclusion

We find no error in the proceeding of the trial. The district court admirably handled these issues. *The judgment is affirmed.*

---

**4.** Defendant did not argue in his brief that this alleged impairment of his opportunity to cross-examine Milette at the suppression hearing affected the outcome of that hearing.